May it please the Court, my name is Richard Lipton. I represent appellants Henry Samueli and Tom Ricks, and I would like to save three minutes for rebuttal. All right. This is a tax case concerning the treatment of a securities loan. The tax court concluded that the transaction at issue was not a securities loan because it did not, in the Court's view, satisfy the requirements of 1058b3. The Court then recharacterized the transaction that occurred as two separate transactions, neither of which, in fact, occurred. The case is before this Court for de novo review because there are no factual issues. The Court should reverse and remand this case to the tax court for at least five separate, independent reasons. First, the tax court erroneously treated Section 1058 as establishing the minimum requirements for a securities loan, whereas that provision only provides a safe harbor under which certain securities loans are non-taxable. Second, the tax court erroneously required that every securities loan be repayable on demand, which is directly contrary to the statutory language of both Section 1058b3 and Section 512a5b. Basic principles of statutory construction establish that Section 1058b3 cannot be interpreted to require that securities loans must be repayable on demand. Third, the tax court simply ignored the proposed regulations issued by the IRS to require a five-day repayment requirement for securities loans under Section 1058b3. Those proposed regulations were withdrawn in response to adverse comments, yet the tax court found that the plain statutory language mandates immediate repayment of all securities loans and prohibits term securities loans, which is a far stricter test than set forth in the proposed regulations. Even the government implicitly concedes in its brief that the legal test set forth in the tax court's opinion was wrong. The government argues that there should be a short period inferred into the statute for repayment of a securities loan, even though that language doesn't exist in 1058b3 either. Fourth, the tax court concluded that the impellents had a short-term capital gain with respect to the receipt of payment made to settle contractual rights that were outstanding for more than a year and which generated a $13 million profit. The tax court's recharacterization of the transaction makes no sense. REFCO did not enter into a one-day contract to allow the impellents to purchase securities in the morning and then resell them to REFCO that same afternoon at a $13 million gain. Finally, the tax court ignored the real economic risks that were undertaken by the parties in this transaction, which underlie the securities loan that was entered into between REFCO and the impellents. Each of these errors is independent, and each one of them is a sufficient reason for this Court to reverse and remand the case. Let me now turn into detailed discussion of each of these points. First, as background, it's important to recognize that securities loans have been around for decades. Owners of securities frequently lend them to brokers and dealers. Section 1058 was enacted to prevent recognition of gain as a safe harbor if somebody enters into a securities loan. If I own appreciated IBM shares and I lend them to my broker, that would have been a taxable transaction under Provost. The IRS had for decades adopted policies not taxing those transactions. When the IRS wavered on its policies, Congress enacted Section 1058 as a safe harbor to prevent taxation of those transactions. This case would have been a lot more understandable if that's what happened in this case. Unfortunately, that's not what happened in this case. There was a little more than just lending the securities to the broker. That's exactly right, Your Honor. What happened was you had a purchase of the securities followed by a loan of those exact same securities. So that actually leads to the point that Section 1058 is only a safe harbor. If you're not within, if a transaction is not within Section 1058, it's a taxable securities loan. It still is a securities loan. If this transaction was taxable because the securities had a cost basis equal to the loan itself. Therefore, that's why we state on brief that, in fact, the application of Section 1058 here was a red herring, because it didn't matter to the underlying tax consequences of the overall transaction. I don't know if that's – I don't know if I agree with that premise. Well – Go ahead. I'm just trying to understand your argument. That's – Your Honor, I want to emphasize that you had a purchase of securities and a lending of them. If I pay $100 to buy a security and then I lend it that same day and its fair market value is $100, even if that transaction doesn't satisfy 1058b3, so it's taxable, I don't have any gain to recognize. But there were additional – I don't know if you want to call them transactions. There were additional actions. It wasn't just the purchase of the security, loan them to the broker, end of back and forth, put it that way. So it was the other activities that took place that called this – these series of events into questions as taxable events. And that's what I'm struggling with in terms of your argument. It's not just a pure and simple buying securities, loan them to brokers, end of story. That's the difficulty I'm having with your argument. Let me try to dig into your pieces. But let me just first focus on one point and then I'll try to make sure I put it into the economic consequence. The court below focused on 1058b3. And what the court said was the legal test was that all securities loans had to be repayable on demand. Clearly, that's what it said in its opinion. But that is completely contrary to both the statutory language and, more importantly, 512a5b, enacted at the exact same time. Well, payable on demand is not – I mean, it's a term of art as used by the court, demand being as defined, you know, within the regulations or the appropriate practices within the industry. So, I mean, I don't think the court meant literally on demand, like demanded one second, pay the next second. So that argument's not persuasive to me, that because the court said payable on demand, it took it outside. Well, the court certainly did not give any reference to 512a5b. They referred to it and just said it doesn't apply. 512a5b would have allowed a five-day repayment. And that's only for lenders of securities who are tax-exempt entities. As the New York State Bar Association report, which you know came out after all of these cases to look at this area, indicated the language in the court's opinion is very troubling to the entire industry because it certainly implies that securities loans need to be repayable on demand, which is not market practice. In fact, market practice is termed securities loans. But let me go directly to Your Honor's question about the overall transaction. You had a purchase of securities. You then had a lending of the securities. When those securities were loaned, there was collateral. That collateral required a payment of cash. Was the collateral the actual securities? No. The securities were for Refco. Refco sold the securities to the taxpayer, who lent them back to Refco. Okay. So then what was the collateral? The collateral was cash. And the cash was the amount. And then who had the cash? The cash was received by the taxpayer. They were obligated to pay interest. Received from whom? From Refco. Okay. So the taxpayer loaned Refco the securities. Refco gave the taxpayer the equivalent amount of money that the taxpayer had given in securities. That is correct. So the same value. The value of the securities was then given to the taxpayers by Refco in money. That is correct. Okay. So it's kind of a wash at that point. It was. It's really a wash. What you have here, Your Honor, when you think through it, is this transaction involved, in the end, you had a fixed rate loan, and you had securities that bore a fixed rate of interest. These were Fannie Mae and Freddie Mac strips. It's a lot of, as my grandmother would say, gyrations in order to accomplish a wash. Well, it wasn't a wash because the securities, which had been loaned, bore a fixed rate of interest, and the collateral, the obligation of the appellants was to pay floating interest. Therefore, if interest rates declined, the appellants made a big profit. If interest rates rose, they would have incurred a loss. Was it true collateral at that point, though? It was true collateral, but it was used, the cash was used to repay the loan. But the obligation to pay the floating interest remained. Your Honor, when you think this transaction through, there are multiple ways to engage in a bet on the movement of interest rates. You could do forward contracts. You could do derivatives. You can enter into short sales. This is just a different way to do it. Granted. The question is whether or not it's a taxable event at that point. Nobody questions the ability of, you know, financiers and people who are taking, you know, doing business with them to transact the business in any way they see fit. The question then becomes whether or not there's a short-term gain in the process. But, Your Honor, it could have been a taxable event in 2001 when the transaction was entered into. We don't care if it's taxable in 2001. The only gain occurred in 2003 when the cash was paid. More than a year later, the appellants received $13 million profit. The Court found that that was a short-term gain. That's completely illogical. There was a contract outstanding for you. I wish I could invest $22 million for a day and make a $13 million profit. Oh. Yeah. But the world doesn't work that way. It had that money to it. But the bottom line is they made a $13 million profit. The Court below erred in finding that a securities loan had to be repayable on demand. It further erred by finding that this was a short-term capital gain. Now, if we disagree, it seems that your main objection to the tax court's decision was that the securities had to be repayable on demand. Is that your primary objection? I said there were five separate objections because I think all of them are substantive. I think that you're going back to that one more than any other. Well, I'm going back to that one because it's the most obvious of the errors made by the tax court. But I want to repeat that the capital gain, treating it as a short-term capital gain is completely illogical. Let me add that the Court also completely erred in its recharacterization of the transaction. The Court simply ignored the fact that there were real risks placed on both the appellants and REFCO during this transaction. I think all of those go back to the Court's determination that it didn't, that the transaction didn't comply with 1058. Well, there is no question that the Court focused on 1058b-3. As we said, we think that that focus was erroneous because 1058b-3 goes to whether the original loan was taxable. And because the taxpayer had just bought the securities, they don't care whether the original loan was taxable. That's not what recognized any gain. The gain was a year later when they got paid the $13 million. So, yes, the Court did go completely off on a wrong tangent. How did it get on that tangent? If you look way back in this case, the original notice of deficiency from the IRS said 1058b-3 is not satisfied. The parties did argue that on the briefs below. I wasn't involved in the case below. In fact, 1058 has almost nothing to do with this case when you really cut through it all. You had a transaction which was a securities loan. Whether or not it was taxable doesn't really matter. What matters here is you had a loan in substance. You had a party that entered into the transaction to bet on interest rates. It could have done it multiple ways. It did it as a securities loan. Once you view it as a loan, then there was interest that accrued on that loan, variable rate interest that they're entitled to deduct. And there was a gain more than a year later, long-term capital gain. Do you want to save time for rebuttal? Yes, I'm sorry. Thank you very much, Your Honor. Good morning, Your Honor. I'm Bethany Hauser for the Commissioner of Internal Revenue. I'd like to start by highlighting two points that the New York Bar made in its report that I think helped explain the relationship between 1058 and this case. The first is that, and this is at page 7 of the report, is that taxpayers could have achieved all of their economic goals here simply by taking out a variable-rate margin loan and purchasing the strip with that loan. And purchasing the securities with that loan? The securities, yes. Purchasing the securities with that loan. And the reason for all the additional gyrations in this case is, as the New York Bar explains at page 8 of their report, is to avoid reporting the accreting yield on the security. That's because this security that they wanted to use as their baseline fixed-gain device, ordinarily a taxpayer would have to pay ordinary income on the gain from that security as it increased in value. To avoid reporting that gain, so what they wanted to do was deduct the interest payments currently as things were as the transaction was taking place, but delay all the income until the end, and then pay long-term capital gain. Was their interest physically paid during this time? The only interest that was physically paid during this time was the 7.8 million paid at the end of 2001, and there's a series of e-mails about that where the taxpayers and their counterparty, REFCO, explain that, oh, REFCO can get this back to you right at the beginning of 2002, about two weeks after you pay it. I'm not sure that we should really consider that a payment of interest. It seems that at least the way the parties behaved, the interest was not actually required to be paid until the transaction closed in 2003. So what's your response to opposing counsel's argument that Section 1058 is irrelevant to the analysis of this transaction? Well, as the New York Bar points out, taxpayers were the ones who first went to Section 1058, and they went to Section 1058 because they thought it gave them a way to get the securities out of their hands so that they wouldn't have to pay current income, but still take the deductions in order to have current deductions on the interest. And their idea was that Section 1058b-2 requires that a securities loan agreement pass on all dividends and interest paid by the security to the lender of the security, but it doesn't require that these the income that's attributed under an accreting yield situation with this particular type of security at issue here be passed through. So they had this very, I would say, highly technical reading of Section 1058b-2 that they thought was favorable to them. And so they therefore brought 1058b – 1058 into the picture in order to rely on this technical reading of 1058b-2. The – now they're trying to say 1058 doesn't really matter. You look at whether it's a nonrecognition transaction under background principles. Well, they didn't feel it was a nonrecognition transition – transaction under background principles at the time they did it, or they wouldn't have been relying on this technical reading of 1058b-2. But why does that matter? They – I mean, if they thought they were qualifying under 1058 and now they realize they weren't, but they say, okay, ignore 1058, we still get the treatment we want because even if this is a taxable securities loan, it comes out our way. So, I mean, that's the issue that I think I'd like to hear your response. My colleague here has made the point that if it's a taxable securities loan in 2001, it doesn't matter because their basis is the same as the amount they got back, and that's a wash, and that's true. But what does matter is that that means that the nonrecognition doesn't just affect basis, it affects the holding period. So if – and, of course, what they want, what they're arguing for here is the long-term capital gain, not the short-term. And so if they lose the holding period from 2001, then if they can't – It's taxable. Then it's taxable as the short-term capital gain, as the tax court explained, that they bought the security that, in terms of taxable transactions, whatever they are under other legal regimes, they had a sale and a resale in 2001. There's no tax from that, but there's also no holding period from that. And then a sale and a resale in 2003, there's taxable gain from that, and it's because it's only a very short period of time, it's short-term capital gain. The other question in this case is whether they can take interest deductions as they go along. Here the only one they tried to take was the $7.8 million deduction for 2001, which, again, in the record looks somewhat questionable as to the reality of that payment because it was given back immediately, very shortly thereafter. And the – but the other argument that the tax court made and that we made in briefs is that there was no actual obligation to pay the interest at that time. And under the Livingstone cases, if you create these paper obligations to pay interest but there's no actual underlying obligation, then there should be no interest deduction. Since you're pausing, let me ask you a side question. You referred several times to the New York State Bar's report. Yes. Do you agree with their sort of underlying worry that this case creates some uncertainty about the application of 1058? Thank you for asking that question. The New York Bar report specifically says that they're concerned about a sort of maximalist reading of the tax court, that the most literal, most extreme version of possible reading of what the tax court said would undermine this ordinary market practice. And we didn't bring this case to undermine ordinary market practice in 1058, with the application of 1058. The New York Bar argues for a three-month rule, for the administrative creation of a three-month rule. Obviously, there are a lot of places the line could be drawn between the three-month rule and what happened in this case, which was a fixed term of over a year. In fact, the New York Bar report talks about how it would be advisable for that, for the permissible fixed term to be shorter than a year so that no long-term capital gains issues were implicated. And it's also a far cry from the market practice that's been discussed of demand on three-day, of loans that are repayable on demand plus three days or demand plus five days. So I don't think it's necessary here to pick the exact place where that line should be drawn, because the securities loan, what they structured here was so far removed from the run-of-the-mill securities loan that it's easy to say this one doesn't qualify under 1058 without impacting the treatment of ordinary run-of-the-mill market transactions. So what about, and I may have this wrong, but I think the theory that they enunciated in their reply brief, therefore, after your own brief was in, was that what happened was that they were giving up the right to get these securities back on demand in 2001, and that was a contractual right which then got liquidated in 2003. So the security was, the asset was this contractual right. And therefore, it was a long-term asset which wasn't liquidated until 2003. What about that? Well, I think the tax court addressed that at the end of its opinion. It said that's just inconsistent with the record. What the record shows is that they repurchased the security or got the security back from REFCO, if you're construing it as a loan, and then sold it the same day or the very next day for their $13 million. It's certainly not how it was characterized at the time by the parties, is their version of it. I think the way the parties characterized it has to do with receiving the security back on the loan. Otherwise, if the REFCO returns, the term loan agreement ends. So taxpayers are entitled to their return of their security, and then they sell the security at the profit. I just also like to point out that if the, that on that theory, that this was a long-term contract that was just being cashed out in 2003, and therefore it should be long-term capital gain, because what's really going on here is that the taxpayers are trying to convert the ordinary income that would ordinarily, that would in the usual course, accrue to them on this particular type of security into long-term capital gain, that they should, that under Section 1258, that should, which is a rule to combat abusive transactions intended to turn short-term ordinary income into long-term capital gain, that it should be recharacterized under that provision, 1258. If there are no more questions. No. Thank you. Thank you, Your Honors. Four key points. First, we do recommend you read carefully the New York State Bar Association report. That's why we submit it to the Court. It points out some of the underlying errors made by the tax court. I would point out. Concerns, not necessary errors. Yes, Your Honor. I would point out, though, that on page 18 of the tax court's opinion, it is explicitly explicit. It says, a taxpayer, that Section 1058b3 is satisfied only if the taxpayer is able to affect the sales security in the ordinary course of the relevant market. Whenever the security is in the market, it must be able to do it on each day during the loan period. It's the specific words in the tax court's opinion. That's why this opinion is wrong and has to be reversed. Furthermore, on the long-term capital gain, with all due respect to Ms. Hauser, it defies economic reality to say that the taxpayer purchased a security one day and sold it for $13 million more, representing accrued interest, the next day. That $13 million of gain accrued over the entire term of this transaction, which was over a year. That's the definition of a long-term capital gain. The government has said they want to look at 1258. That has not been briefed to this Court. Both parties agreed on brief, that if 1258 is to be looked at, that's something that should be looked at by the tax court. But the tax court erred in this transaction in simply saying there was a one-day transaction that generated a $13 million gain. Ginsburg. To read the opinion as a whole, we can't just parse out a couple of words and say that those words are the determining reasoning of the Court. I think, you know, read as a whole, the tax court opinion does, you know, has some wiggle room in there. Even if you read it as a whole, Your Honor, the lower court still viewed the definition of a securities loan as depending on 1058b3. And as we said, whether or not you had a securities loan here is independent of application of 1058. All right. Thank you, Counsel. Thank you to both counsel for your argument in this complex case. The case, as argued, is submitted for decision by the Court.
judges: Tashima, Rawlinson, Cjj Rakoff (S. New York), Dj